UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

DOUGLAS M. JOHNSON et al.,          :
    Plaintiffs                        :
                                      :
    v.                                :     CIVIL ACTION NO.
                                      :     3:04-cv-0802 (JCH)
NYFIX, Inc. et. al.,                :
    Defendants.                       :     OCTOBER 3, 2005

## RULING ON DEFENDANTS'
## MOTION TO DISMISS [Dkt. No. 21]

## I. Introduction

Lead plaintiffs Douglas M. Johnson (as a partner of DMJ Family LPLLP and a
trustee of Douglas M. Johnson Trust), THS&H Investment Associates LLC, and Bruce
Frank ("plaintiffs") bring this action on behalf of themselves and all others who
purchased or otherwise acquired the common stock of NYFIX, Inc. ("NYFIX") during the
Class Period of March 30, 2000 to March 30, 2004.  Plaintiffs allege that defendants
NYFIX, Peter Kilbinger Hansen, Richard A. Castillo, George O. Deehan, William J.
Lynch, and Carl E. Warden violated Section 11 of the Securities Act of 1933 (the
"Securities Act"), 15 U.S.C. §77k (Count I) and that Hansen and Castillo violated
Section 15 of the Securities Act, id. at §78o (Count II).  Plaintiffs further allege that
NYFIX, Hansen, Castillo and Hahn violated Section 10(b) of the Securities Exchange
Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b) and Rule 10b-5 promulgated
thereunder by the Securities Exchange Commission (SEC) (Count III), 17 C.F.R. §
240.10b-5.  Finally, they allege that Hansen, Castillo and Hahn violated Section 20(a) of

1

Dockets.Justia.com

the Exchange Act, 15 U.S.C. § 78t(a) (Count IV).  All of these claims arise from NYFIX's

method of accounting for its investment in NYFIX Millenium, L.L.C. ("Millenium"), which

led NYFIX to report inflated financial results in numerous SEC filings and press

releases.

Defendants move to dismiss the plaintiffs' First Amended Class Action Complaint

(the "Amended Complaint") pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) and the

Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4 <u>et.</u>

<u>seq.</u>  For the reasons that follow, Defendant's motion is granted with respect to Counts I

and II and denied with respect to Counts III and IV.

## II. Factual Allegations

For the purposes of this Motion to Dismiss, the court accepts as true the facts

alleged in the plaintiffs' Amended Complaint and draws reasonable inferences in

plaintiffs' favor. <u>See</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>overrruled on other</u>

<u>grounds by</u> <u>Davis v. Scherer</u>, 468 U.S. 183 (1984); <u>Grandon v. Merrill Lynch & Co.</u>, 147

F.3d 184, 188 (2d Cir. 1998). The Second Circuit has deemed a complaint to include

documents incorporated therein by reference, public disclosure documents required to

be filed and actually filed with the SEC, and "documents that the plaintiffs either

possessed or knew about and upon which they relied in bringing the suit."  <u>Rothman v.</u>

<u>Gregor</u>, 220 F.3d 81, 88-89 (2d Cir. 2000).

### A. Allegations Common to All Counts

NYFIX, Inc. is a publicly-traded New York corporation engaged in the business of

providing electronic trading technology to the brokerage industry.  Its principal offices are located in Connecticut.  Hansen has served as NYFIX's Chairman of the Board and Principal Executive Officer since June 1991. Castillo served as NYFIX's Chief Financial Officer from September 16, 2002, and is currently NYFIX's Chief Administrative Officer. Hahn has served as NYFIX's Chief Financial Officer and Secretary since January 1, 2003.  Deehan, Lynch and Warden have served as NYFIX directors since August 2000, June 2000, and August 1993, respectively.  (Compl. ¶ 10-16).  The individual defendants received compensation from NYFIX in the form of cash and stock options.

### 1. NYFIX's Relationship with Millenium

In September 1999, NYFIX joined with seven other partners (the "Initial Partners") to form Millenium.  Each of the seven Initial Partners invested $2 million and received 25,000 units of Millenium stock. Collectively, the Initial Partners owned 50%. NYFIX owned the remaining 50%, even though it had invested only $2 million, apparently because of "its control of Millenium's operations and expected continued growth." (Compl. ¶ 19).  NYFIX also purchased an option to buy an additional 30% of Millenium. When Millenium added four "New Partners" in March 2001, NYFIX maintained 50% ownership in exchange for a reduction in its rights to share in future Millenium distributions and purchased an option from the New Partners.  NYFIX shared expenses with, made joint operational decisions with, and lent funds to, Millenium. (Compl. ¶ 19-20, 22-23).

NYFIX recorded its investment in Millenium under the Equity Method of accounting, as an asset of $27,500,000. This sum included the $2 million cash the company had invested, the value of the stock it had paid for the option from the Initial

Partners ($17,502,187.50), and the value it had paid for the option from the New

Partners ($8,001,280).  NYFIX also recorded an asset of $11.2 million for costs it

incurred on behalf of Millenium and operating loans it made to Millenium.  (Compl.¶ 22).

Plaintiffs allege that NYFIX's control of Millenium made the Equity Method of

accounting inappropriate for this situation.  They assert that NYFIX should have

consolidated Millenium's finances with its own finances, thereby reporting lower

earnings.  (Compl. ¶ 22-23).  As a result of its failure to do so, plaintiffs allege that

NYFIX's annual report for fiscal year 2001 ("2001 Form 10-K") overstated NYFIX's net

earnings by $11,593,000 and understated its operating expenses by $11,550,000.

They further allege that NYFIX's first two quarterly reports for fiscal year 2002 (the

"1Q02 10-Q" and the "2Q02 10-Q") "contained reported finances that materially

understated NYFIX's losses and improperly accounted for NYFIX's acquisition of

Millenium." (Compl. ¶ 27).[1]  Plaintiffs list a number of Generally Accepted Accounting

Principles ("GAAP") that defendants violated. (Compl. ¶ 31-33).

On February 1, 2002, NYFIX increased its interest in Millenium to 80%. (Compl.

¶ 24).

### 2. Registration of NYFIX Shares Paid to Javelin Shareholders

On March 31, 2002, NYFIX purchased Javelin Technologies, Inc. ("Javelin"), a

provider of electronic trading technology, for $56 million. (Compl. ¶ 30).  Of this amount,

$44 million "would be paid in NYFIX common stock." (Compl. ¶ 25).  On August 16,

2002, NYFIX filed SEC Form S-3/A (the "Javelin Registration Statement" or "registration

---

[1]Additional statements by defendants that plaintiffs allege to be misleading will be summarized in
Part I.B. below, as they are not incorporated in the Section 11 or Section 15 claims.

statement").[2]  (Id. at ¶ 27).  The Javelin Registration Statement asserts that "[t]his prospectus relates to the offering by the selling shareholders of an aggregate of 2,784,896 shares of our common stock, consisting of shares we issued to them in connection with our acquisition of Javelin Technologies, Inc." (Kibler Aff. Ex.H at 4). The Amended Complaint asserts that the named plaintiffs "obtained NYFIX common stock registered under the Javelin Registration Statement," (Id. at ¶ 39), although it does not specify the precise date of acquisition.  Plaintiffs Johnson, THS&H, Frank, and certain other class members were Javelin shareholders who received NYFIX stock as part of the acquisition transaction. (Id.)

The Javelin Registration Statement incorporated by reference several previous SEC filings:  NYFIX's annual report for the fiscal year 2001 and quarterly reports for the first and second quarters of fiscal year 2002. All accounted for Millenium under the Equity Method. (Compl. ¶ 27).  The accounting treatment that NYFIX used to account for the Millenium investment in the 10-K incorporated in the Javelin Registration Statement was audited and approved by the accounting firm Deloitte & Touche LLP. (Kibler Aff. Ex. D at 33; Ex. H at 20).  Plaintiffs contend that the misleading financial information artificially inflated the price of NYFIX stock, allowing NYFIX to acquire

---

[2]NYFIX filed a SEC Form S-3 registration statement regarding the same transaction on May 15, 2002. (Compl. ¶ 26). However, as both the S-3 and S-3/A indicate, the registration of the shares in question was not effective until the SEC Form S-3/A supplement was filed on August 16. The pertinent regulation states that

> for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

17 C.F.R. § 229.512(a)(2) (1990).  The plaintiffs focus their Section 11 claim on the Form S-3/A.

plaintiffs' shares in Javelin for "significantly less consideration than had the truth concerning NYFIX's accounting practices been known." (Compl. ¶ 28).  Hansen, Castillo, Deehan, Lynch and Warden signed the Javelin Registration Statement personally or through a power of attorney.  (Compl. ¶ 27).

### 3. Restatement of NYFIX's 2001 Finanancial Results

In March 2004, NYFIX announced a restatement of its financial results for 2001 (as well as several other years, to be discussed below).  (Compl. ¶ 3).  The subsequent restatement corrected the reports incorporated in the August 2002 Javelin Registration Statement.  With reference to the results for the year ending December 31, 2001, the restatement indicated that NYFIX had overstated gross profit by 17%, understated operating expenses by 45%, overstated operating income by 726.4%, overstated net income by 335.3%, overstated income per basic common share by 330.8%, and overstated income per diluted common share by 323.1%.  (Compl. ¶ 28).

### B. Additional Allegations Incorporated into Sections 10(b) and 20(a) Claims Only

Throughout the Class Period, NYFIX reported its financial results in press releases and SEC filings without consolidating Millenium's financial results with its own. This reporting was accompanied by positive expressions of NYFIX's profitability and future growth potential.

The 2004 restatement covered financial results for 1999, 2000, 2001, 2002 and the first three quarters of 2003. The restatement revealed that NYFIX was overvalued during these periods. For example, NYFIX's Form 10-K for 1999 had overstated gross profit by 21.7%, understated operating expenses by 69%, overstated operating income

by 107.3%, and overstated net income by 105.8%. (Compl. ¶ 55).  For 2000, NYFIX had overstated gross profit by 14%, understated operating expenses by 48.2%, overstated operating income by 525.4%, and overstated net income by 13.4%. (Compl. ¶ 62).  For 2001, NYFIX had overstated gross profit by 17%, understated operating expenses by 45%, overstated operating income by 726.4%, and overstated net income by 335.3%.  (Compl. ¶ 70).  For 2002, NYFIX had overstated gross profit by 5.8%, understated net loss by 37.2%, and overstated operating income by 16%; although it also understated operating expense by 0.7%. (Compl. ¶ 78).  For the first three quarters of fiscal year 2003, NYFIX's SEC filings overstated its assets by 8%.  (Compl. ¶ 80). The original 1999, 2000, and 2001 Forms 10-K also stated that NYFIX had prepared its financial statements in accordance with GAAP.

In addition to the accounting concerns discussed above, NYFIX's amended 2002 Form  10-K revealed that NYFIX would incur a charge for $16.4 million because it had overpaid for the Option to purchase additional Millenium stock. (Compl. ¶ 85).  The plaintiffs also list numerous GAAP violations revealed by the restatement. (Compl.¶ 90).

NYFIX's stock price dropped beginning in March 2004, following two public disclosures regarding the restatement of earnings. In March, it dropped 7% after the initial press release informing the public of the impending restatement. In May, when NYFIX announced the substance of the restated financials, it dropped to 30 % below its trading price prior to the March press release. (Compl. ¶ 81-83).

During 2002 and 2003, the defendants used NYFIX's inflated stock to issue a secondary offering and to purchase other companies. (Compl. ¶¶ 49, 96).  Hansen, Castillo and Hahn had personal holdings of NYFIX common stock and options, and

7

Castillo held loans partially secured with company stock.  (Compl. ¶ 11, 12, 97).

The individual Section 10(b) defendants were informed about NYFIX's financial condition.  They participated in drafting, reviewing, approving, and/or disseminating NYFIX's public financial disclosures during the Class Period. (Compl.¶ 106-07).

## III. Discussion

### A. General Pleading Standards

A motion to dismiss filed pursuant to Rule 12(b)(6) can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  A Rule 12(b)(6) motion to dismiss cannot be granted simply because recovery appears remote or unlikely on the face of a complaint.  Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Id. (quotation omitted).  However, "bald assertions and conclusions of law will not suffice" to meet this pleading standard. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996).

Federal Rules of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. §78u-4(b)(1)(B), provide heightened pleading requirements that apply to certain aspects of plaintiffs' claims. Because the issue of which pleading standard applies to plaintiffs' claim under Section 11 of the Securities Act is disputed, the standards will be discussed further in the discussions of each claim below.

### B. Exchange Act Claims

#### 1. Pleading Standard for Fraud Claims

Federal Rule of Civil Procedure 9(b) states, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Violations of section 10(b) are allegations of fraud; thus, plaintiffs must plead them with particularity under that Rule. Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000). The PLSRA, 15 U.S.C. §78u-4(b)(1)(B), also applies to private actions under Section 10(b). E.g., Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). The PSLRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all the facts on which the belief is formed." 15 U.S.C. §78u-4(b)(1)(B).

Section 10(b) of the Exchange Act prohibits the use or employment,

in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or any securities-based swap agreement, or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. SEC Rule 10b-5, promulgated thereunder, makes it illegal

(1) To employ any device, scheme, or artifice to defraud,
(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. There is an implied private right of action under these provisions. E.g., Dura Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627, 1631 (2005). Where allegations involve securities traded on a public market, a plaintiff

must establish the following elements: (1) materiality of the misrepresentation or omission; (2) scienter, or wrongful state of mind; (3) that the fraud was in connection with a purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) a causal link between the misrepresentation or omission and the loss. Id. (internal citations omitted). Of the six prongs, defendants' motion to dismiss rests on scienter and on the materiality of five particular statements.  At oral argument, defendants confirmed that they are not challenging plaintiff's claims under the remaining prongs of section 10(b).

## 2. Scienter

Although Rule 9(b) states that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," the PSLRA imposes a heightened standard for pleading scienter in private securities fraud actions. "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all the facts on which the belief is formed." 15 U.S.C. §78u-4(b)(1)(B). The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In a complaint alleging violation of section 10(b) of the Exchange Act, a plaintiff must allege that defendants had "'an intent to deceive, manipulate or defraud.'" Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Ganino, 228 F.3d at 168 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976))).  The plaintiffs must allege facts sufficient to "give rise to a strong inference of fraudulent intent." Kalnit, 264 F.3d at 138 (quoting Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir.2000)).

10

They may establish this inference "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. (internal quotation marks and citation omitted).

a. **Motive and Opportunity.**  Defendants' opportunity to commit fraud is undisputed. The complaint states that the individual defendants were senior officers at NYFIX: Hansen was Chairman of the Board and President and Principal Executive Officer; Castillo was Chief Financial Officer and subsequently Chief Administrative Officer; and Hahn was Chief Financial Officer and Secretary. Thus, they had the opportunity to commit fraud in financial reporting. Cf. Kalnit, 264 F.3d at 139 ("[I]t is undisputed that the individual defendants, as Directors of MediaOne, had the opportunity to commit fraudulent acts.").

However, the plaintiffs have failed to adequately plead motive.  "Sufficient motive allegations 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" Kalnit, 264 F.3d at 139 (quoting Novak, 216 F.3d at 307 (internal quotation marks and citation omitted)). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud. Id. (quoting Novak, 216 F.3d at 307-08).  Merely alleging that directors wanted "the corporation to appear profitable," "to keep stock prices high to increase officer compensation," or to gain a similar benefit that would be shared by all corporate directors or shareholders does not establish motive. Id.  Motive must be particular to the individual defendants. For example, the Second Circuit has

11

found sufficient motive allegations where plaintiffs plead that defendants "misrepresented corporate performance to inflate stock prices while they sold their own shares." Id.

Plaintiffs do not allege any particularized motives of the type necessary to satisfy the Second Circuit's test.  The complaint states that Hansen's salary was determined in part by assessments of the Company's "capital base." (First Amended Class Action Compl. ¶ 11). However, the Second Circuit has already rejected incentive compensation as a basis for establishing motive.  Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir.1995), cited in Kalnit at 141. The complaint states that Castillo owned a large number of stock options and received loans from NYFIX that he secured with company stock. (Cmpl. ¶ 12). The Second Circuit has rejected ownership of stock as a basis for establishing motive. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130-31 (2d Cir. 1994); see also Novak (holding that pre-PSLRA pleading standards remain relevant). Stock ownership establishes motive only if defendants are also alleged to have benefitted from an inflated stock price in a particular manner, for example, by selling a large number of shares shortly after the alleged fraud.  Id. (citing Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir.1985).  Plaintiffs make no such allegations.  The loans secured with stock are analagous to stock ownership.  Absent any allegations that Castillo benefitted from the inflated stock price immediately in a more direct and less common manner, this allegation is insufficient to establish motive.

Plaintiffs further allege that defendants used artificially inflated NYFIX stock to raise funds in a secondary offering, and then purchase partial or full interest in four other companies during the Class Period.  (Compl. ¶ 96).  Courts have previously held

12

this claim insufficient to establish motive.  Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004) (holding that seeking to inflate stock price to "complete a previously arranged corporate acquisition of Eagle Quest and to retire debt" was insufficient motive allegation); In re Health Mgmt., Inc. Sec. Litig., 970 F.Supp. 192, 204 (E.D.N.Y. 1997); see also Leventhal v. Tow, 48 F.Supp.2d 104, 115 (D.Conn 1999) (holding allegations that defendants artificially inflated stock price to obtain favorable terms in stock-for-stock transactions and debentures insufficient to establish motive).  As in Health Mgmt., the plaintiffs "do not expressly or even inferentially explain how the desire to conclude various acquisitions by using inflated value of the stock as consideration for mergers and to obtain financing for such acquisitions, is in the informed economic self-interest of the Individual Defendants beyond those expressly rejected by the Court [in previous cases]." 970 F.Supp. 192 at 204.  Indeed, seeking to maximize NYFIX's profitability constituted "part of the officers' and directors' financial responsibilities to the Company." Rombach, 355 F.3d at 177.

For the preceding reasons, the court concludes that the plaintiffs have not established a strong inference of fraudulent intent through motive and opportunity.

**b. Strong circumstantial evidence of "conscious misbehavior" or "recklessness."**  "'Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.'"  Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) (citing Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987), overruled on other grounds by United States v. Indelicato, 865 F.2d 1370 (2d Cir.1989) (en banc)). The Second Circuit defines reckless conduct as "at

13

the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal citation omitted). "Although this is a highly fact-based inquiry, generalities can be drawn. '[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'" Id. (citing Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir.2000)). Where, as here, plaintiffs allege that defendant corporate officers or directors are liable for a company's misleading financial statements, plaintiffs "must supply some factual basis for the allegation that the defendants had reached this conclusion [that the statements were misleading] at some point during the time period alleged." Rothman v. Gregor, 220 F.3d 81, 91 (2d Cir. 2000).

The Amended Complaint does not point to any specific source from which defendants received knowledge of flaws in NYFIX's accounting for Millenium prior to 2004.  It alleges that Castillo, Hahn and Hansen,  considering their high-ranking positions in NYFIX, knew or should have known of the actual nature of the Millenium transactions.  But to meet the standard above, plaintiffs must plead specific facts from which one can strongly infer that defendants knew or should have known not only the actual nature of the individual transactions (as plaintiffs do not allege that defendants misrepresented individual transactions), but also the false or misleading nature of the statements regarding NYFIX's overall financial results (the subjects of the section 10(b) claim). Cf. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994)

14

(finding no conscious misconduct or recklessness where plaintiffs alleged that bank corporation maintained loss loan reserves that turned out to be inadequate, but failed to allege that defendants' disclosures were inconsistent with data they had at the time of the disclosures).  That is, the alleged facts would have to support a strong inference that defendants knew or should have known that NYFIX's method of accounting for Millenium was leading to artificial inflation of financial results.

The plaintiffs argue that the combination of GAAP violations and the "resulting, drastic overstatement of financial results and other misleading statements" revealed by the restatement  "give rise to a strong inference of scienter." (Plfs.' Mem. Opp. Defs.' Mot. Dismiss 22).  As plaintiffs' counsel acknowledged at oral argument, GAAP violations generally do not suffice to establish strong circumstantial evidence of recklessness.  Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (citing Chill v. General Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996)).[3]  They may suffice only if coupled with evidence of "corresponding fraudulent intent." Novak, 216 F.3d at 309 (citing Chill, 101 F.3d at 270); see also Rehm v. Eagle Finance Corp., 954 F.Supp. 1246, 1255 (N.D.Ill.1997) ("To adequately allege scienter, in addition to bare allegations of GAAP violations, the complaint must show that defendants recklessly disregarded the deviance or acted with gross indifference towards the purported material misrepresentations contained in the financial statements.").  Thus, the court must next examine whether any allegations concerning the restatement of financial results provide sufficient circumstantial evidence of such intent.

---

[3]Plaintiffs argue that Stevelman reversed the dismissal of a 10(b) claim. However, the Stevelman court found scienter had been alleged under the "motive and opportunity" test, rather than solely based on GAAP violations. 174 F.3d at 85-86.

"Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." Stevelman, 174 F.3d at 84 (citing Acito, 47 F.3d at 53); see also Shields, 25 F.3d at 1129-30 (holding that allegations that a bank should have allocated more funds to its loan loss reserves, where a corrective increase in reserves led to a huge drop in earnings, was insufficient to establish scienter).    Courts have sometimes found a financial restatement of great magnitude relevant to the issue of scienter. E.g., Rothman, 220 F.3d at 92; Rehm, 954 F.Supp. at 1256 ("While it is true that the mere fact that a company's financial reporting was inaccurate does not establish scienter, the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors.") (internal citations omitted); In re Digi Int'l. Inc. Sec. Litig., 6 F.Supp.2d 1089 (D. Minn. 1998).  However, none of the cases plaintiffs cite establish that a restatement of earnings is sufficient to establish a strong inference of conscious misbehavior or recklessness where plaintiffs' only other scienter allegations consist of a list of GAAPs that defendants violated and the existence of corresponding misstatements in the financial reports and press releases.

In Rehm, the Northern District of Illinois held that the allegation that defendants had to restate their financial results following several GAAP violations so as to decrease reported yearly earnings from $3.530 million to $325,000 "weighs heavily in favor of a finding of reckless disregard," particularly because defendants "were responsible for calculating and releasing the financial information." 954 F.Supp. at 1255-56.  The court distinguished the litigants' situation from that in Shields because the Rehm defendants, unlike those in Shields, were alleged to have based their credit loss reserve decisions

16

on credit loss data that was flawed as a result of GAAP violations. The <u>Rehm</u> court reasoned that since the publicly available credit loss data itself was alleged to be flawed, "there might be no direct evidence showing defendants were aware of the true credit loss figures." 954 F.Supp. at 1256-57. It concluded that the plaintiffs should be allowed to plead scienter on the basis of the allegations they had provided because otherwise there would be no way for plaintiffs to attack this type of fraud. <u>Id</u>.

_____Not only is <u>Rehm</u> not controlling, but the instant case does not present the situation described in <u>Rehm</u>. The Amended Complaint challenges the manner in which NYFIX "accounted for its  investment in Millenium" and allocated losses borne by Millenium, (Compl. ¶ 2, 49), rather than the veracity of the underlying data on which this accounting was based.[4]  Thus, the ground on which <u>Rehm</u> distinguished itself from <u>Shields</u> is not present here. Moreover, <u>Rehm</u>'s scienter finding relied not only on the restatement, but also on two additional allegations:  that credit loss accounting was the "defining characteristic" of defendant's business; and that defendants had made public statements assuring investors that the company's credit loss reserves were adequate. These statements gave rise to an inference of scienter particularly because one was made immediately after analysts lowered their ratings of defendant's stock because of inadequate credit loss reserves, and less than two weeks before the company conceded this deficiency.   Even if this court were to accept the reasoning of the Northern District of Illinois, the Amended Complaint makes no comparable allegations

---

[4]In their memoranda the parties do dispute the extent and sufficiency of NYFIX's disclosures of Millenium losses.  <u>See</u> (Defs.' Mem. Supp. Mot. Dismiss 32); (Plfs.' Mem. Opp. Mot. Dismiss 14-15); (Defs.' Mem. Further Supp. Mot. Dismiss 2-3).  But the Amended Complaint does not specifically allege, as would be required to pursue these allegations under the PSLRA, that defendants' financial statements omitted any particular data regarding Millenium's losses.

that defendants continued to stand by NYFIX's financial results after being informed that they might be misleading.

Plaintiffs also urge the court to adopt the reasoning of the District of Minnesota in In re Digi Int'l. Inc. Sec. Litig., 6 F.Supp.2d 1089 (D. Minn. 1998). Digi held that a strong inference of conscious misbehavior arose from a combination of circumstances, including "defendants' failure to disclose the full nature and extent of Digi's investment and involvement in [a development-stage start-up called] AetherWorks, their failure to disclose other facts regarding AetherWorks' business, their inappropriate use of the 'note receivable' method for accounting for this investment, the individual defendants' positions of control in Digi and responsibility for various public disclosures, the individual defendants' incentive-based compensation, and the substantial impact on Digi's performance and stock price once Digi fully disclosed and correctly accounted for its AetherWorks investment." 6 F.Supp. at 1097.  This court rejects the District of Minnesota's reliance on incentive-based compensation as meaningful circumstantial evidence of scienter.  See Acito, 47 F.3d at 54.  It also finds that Digi's scienter holding rested on crucial facts not alleged in the present case.  Most importantly, the plaintiffs in Digi alleged not only that the defendants used an improper accounting method, but also that they concealed numerous details regarding the investment in AetherWorks – details that would have alerted investors to a substantial amount of risk.  6 F.Supp.2d at 1093-94. Those allegations would support a strong inference of scienter because they could imply that the defendants were selectively covering up facts likely to discourage investors.  As discussed in note 4, supra, the Amended Complaint makes no particularized allegations that NYFIX concealed the transactional details of its

investment in Millenium, and therefore does not provide the evidence of scienter present in Digi.

Particularly in light of the fact that the financial statements in question were approved by accounting firms not alleged to have been involved in wrongdoing, see (Kibler Aff., Ex. B at 20, G at 17, D at 33, H at 20, Q at F-2, R at F-2), the Complaint does not state any particular facts that would suggest that defendants knew or should have known that NYFIX was using an inappropriate accounting method.  Cf. Shields, 25 F.3d; Freedman v. Value Health, Inc., 2000 WL 630916, *5 (D.Conn. Mar. 24, 2000) (finding no scienter where complaint lacked allegations that "the defendants knew that any of the bases, on which the loss reserve calculation depended, were not going to occur.")  Thus, even drawing all reasonable inferences in favor of the plaintiffs, this court finds that the Amended Complaint fails to accompany its GAAP allegations with sufficient allegations of the "corresponding fraudulent intent," Novak, 216 F.3d at 309 (citing Chill, 101 F.3d at 270). The plaintiffs have not sufficiently alleged conscious misbehavior or recklessness.

For the reasons above, the plaintiffs have failed to adequately plead scienter. Because the plaintiffs' section 10(b) and Rule 10b-5 claim fails on the grounds of scienter, the court does not reach the defendants' arguments on the materiality of five particular statements.  Defendants' motion to dismiss Count III is thus granted. Because Section 20(a) liability is premised upon a primary violation of the securities laws, 15 U.S.C. § 78t(a), here under Exchange Act section 10(b),  the motion to dismiss Count IV is also granted.

### C. Securities Act Claims

As described above, plaintiffs allege that defendants NYFIX, Hansen, Castillo, Deehan, Lynch and Warden violated Section 11 of the Securities Act in connection with the Javelin Registration Statement. Section 11(a) provides in pertinent part,

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue–
> (1) every person who signed the registration statement;
> (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted . . .

15 U.S.C. §77k(a).  The disputed issues with respect to plaintiffs' section 11 claim are (1) whether plaintiffs acquired their securities within the meaning of section 11; (2) whether the claim is timely; (3) whether the heightened pleading standards of the PSLRA and/or Fed. R. Civ. P. 9(b) apply to the plaintiffs' claim; and (4) whether the fact that NYFIX's financial statements were approved by accounting firms provides an affirmative defense based solely on the pleadings.

### 1. Statutory Standing

The defendants argue that the named plaintiffs lack statutory standing under Section 11 of the Securities Act because they did not acquire their shares pursuant to the registration statement that is the subject of plaintiffs' Section 11 claim.

This court has previously held that Section 11 plaintiffs need not have purchased their securities in their initial public offering, although they must be able to "trace their securities to a registered offering." In re Fine Host Corp. Sec. Litig., 25 F.Supp.2d 61, 66 (quoting Adair v. Bristol Technology Sys., Inc., 179 F.R.D. 126, 130 (S.D.N.Y.1998)

(citing Barnes v. Osofsky, 373 F.2d 269, 272 (2d Cir.1967))).  In Fine Host, this court

characterized the traceability inquiry as a question of "whether the security purchased

by the buyer was issued in connection with a false or misleading registration

statement." Fine Host at 67.

Defendants assert that all of the plaintiffs acquired unregistered shares in March

2002, at the time of the acquisition transaction, and that these shares were registered

by the Javelin Registration Statement nearly five months later. (Defs. Mem. Supp. Mot.

Dismiss 26 ("All that the August 2002 Registration Statement did was allow them to sell

those shares on the open market.")).  However, the Amended Complaint does not

establish this chronology.  It asserts merely that the named plaintiffs "obtained NYFIX

common stock registered under the Javelin Registration Statement," (Compl. ¶ 39).

The Javelin registration statement does state that it was registering shares "issued to

[Javelin shareholders] in connection with" the Javelin acquisition, (Kibler Aff. Ex.H at 4),

which seems to imply that the shares were issued prior to registration.  Yet the

registration statement does not reference the individual plaintiffs and therefore does not

answer the question of when their shares of NYFIX were acquired.

Drawing all reasonable inferences in favor of the plaintiffs, the court concludes

that a reasonable person could find that the plaintiffs acquired their shares in a manner

that would bring them within the scope of section 11.  The defendants' version of the

facts may be proven correct at a later stage in the litigation, in which case the court

would have to decide whether Section 11 applies to shares acquired prior to

registration.  However, the complaint's use of the past tense for the word "registered" is

reasonably read to imply that plaintiffs acquired the securities after they were already

21

registered.[5]  If the plaintiffs did acquire the securities after their registration, they would

satisfy Section 11's acquisition requirement whether they acquired them in the initial

public offering or on the secondary market.  Thus, the plaintiffs have adequately alleged

that they acquired securities registered under the August 2002 registration statement

for purposes of Rule 12(b)(6).

### 2. Timeliness

Defendant's argue that plaintiffs' claims are not timely because plaintiffs were on

inquiry notice of the alleged fraud more than one year prior to the commencement of

this action.  Section 13 of the Securities Act provides,

> No action shall be maintained to enforce any liability created under
> section 77k [Section 11] or 77l(a)(2) of this title unless brought within one
> year after the discovery of the untrue statement or the omission, or after
> such discovery should have been made by the exercise of reasonable
> diligence, or, if the action is to enforce a liability created under section
> 77l(a)(1) of this title, unless brought within one year after the violation
> upon which it is based. In no event shall any such action be brought to
> enforce a liability created under section 77k or 77l(a)(1) of this title more
> than three years after the security was bona fide offered to the public, or
> under section 77l(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m.  "A person is said to be on inquiry notice [of a Section 11 violation]

where 'the circumstances are such as to suggest to a person of ordinary intelligence the

probability that he has been defrauded.'" Jackson Nat'l Life Ins. Co. v. Merrill Lynch &

Co., Inc.,  32 F.3d 697, 701 (2d Cir. 1994) (citing Armstrong v. McAlpin, 699 F.2d 79, 88

(2d Cir.1983) (internal quotations omitted)).  Such circumstances give rise to a duty of

---

[5]At oral argument, plaintiffs' counsel asserted that the registration statement encompassed two
groups of shares: one group that plaintiffs acquired before the effective date of the registration statement
and another that the plaintiffs acquired when the registration statement was effective.  This factual
allegation, as counsel acknowledged, was not incorporated into the complaint. Therefore the Court does
not consider it except to recognize that this factual scenario would not be inconsistent with the allegations
in the Complaint.

inquiry.  In determining whether information available to a plaintiff gives rise to a duty of inquiry, "prospectuses must be read as a whole."  Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) (internal citation omitted). The "central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities]."  Id.  (internal quotation marks and citation omitted).  "The duty of inquiry results in the imputation of knowledge of a fraud in two different ways, depending on whether the investor undertakes some inquiry.  If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose."  LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003) (internal citations omitted).

Inquiry notice can be a question of law or fact. In the Second Circuit, it is a question of law if "no reasonable fact finder analyzing the circumstances as presented, could determine that inquiry notice did not exist." In re Executive Telecard, Ltd. Securities Litigation, 913 F.Supp. 280, 283 (S.D.N.Y.1996) (citing Dodds v. Cigna Securities, Inc., 12 F.3d 346 (2d Cir. 1993); Menowitz v. Brown, 991 F.2d 36 (2d Cir.1993)).

Although the parties dispute the extent of NYFIX's disclosures of Millenium's losses, at the very least the 2001 10-K does state Millenium's net losses for the years 1999, 2000 and 2001, as well as summarizing the investment, allocation of Millenium losses, costs NYFIX incurred with regard to Millenium, and the loan to Millenium. (Kibler Aff. Ex. D at 51-53). Defendants argue that these disclosures would put investors on inquiry notice that the overall financial results might have been misleading.

Defendants direct the court's attention to Jackson, 32 F.3d.  In Jackson, the

Second Circuit held that a prospectus put the plaintiff on inquiry notice as a matter of law that some of the statements in the prospectus were false. First, the prospectus indicated that "[n]one of the securities will be sold unless all are sold," even though the offering lacked provision for an escrow account or refund arrangement, which would be required for an all-or-nothing offering; was conducted on a "firm commitment" basis, which would make no business sense for the underwriter if the offering was all-or-nothing; and even though a subsequent offering memorandum revealed that sixteen months after the initial stock distribution, the underwriter owned about half of the securities offered therein.  Id. at 701-02.  The instant case does not present such an obvious disconnect between written statements and reality, or at least the complaint does not provide enough information to show that it would have been obvious to a person of ordinary intelligence that the method of accounting led to inflated financial results.

        Jackson further concluded that plaintiffs were on inquiry notice that the company was insolvent even though the prospectus said it was solvent.  Id. at 702-03.  Unlike the allegedly misleading financial results in the instant case, the assertion of solvency in Jackson was in the form of an opinion contingent on future events, which the prospectus explicitly warned might not come to pass.  Moreover, the prospectus included accurate financial information demonstrating the impact of a leveraged buyout on the offering company's finances. In the instant case, in contrast, the calculations involving the impact of the Millenium investment on NYFIX's finances are the very ones alleged to be misleading.

        Another important factor in the instant case is that NYFIX's financial statements were audited and approved by an accounting company.  Where financial statements

have been approved by accounting firms, it is not reasonable to expect a person of

ordinary intelligence to examine them in detail for accounting errors. See Executive

Telecard, 913 F.Supp. at 285.  ("A reasonable investor may not be required to look

behind the report. At least a trial juror may so find.") (internal citations omitted).  Deloitte

& Touche LLP, which audited the SEC Form 10-K that NYFIX incorporated in the

Javelin Registration Statement, stated its opinion that the "consolidated financial

statements" of NYFIX and Millenium in this annual report fairly presented NYFIX's

financial situation (Kibler Aff. Ex. D at 33); see (Kibler Aff. Ex. H at 20).  Considering

that an accounting firm found the accounting to be proper, it would be unfair to expect

investors with far less accounting expertise to pick apart NYFIX's accounting.

Courts have also frequently considered the prominence of disclosures or

warnings as a factor that informs the existence of inquiry notice.  E.g., Olkey, 98 F.3d at

5-6 (holding that a second-page risk disclosure was prominent); Dodds v. Cigna

Securities, Inc., 12 F.3d 346 (2d Cir. 1993) (holding that plaintiff was on inquiry notice

as a matter of law where prospectuses contained numerous prominent warnings, one

on the front page of a prospectus in large, bold, capital letters, and some under clearly

marked headings); Executive Telecard, 913 F.Supp. (holding that disclosures in 10-K

were insufficiently prominent to create inquiry notice where they were not in uppercase,

bolded typeface and not referenced numerous times in the table of contents).  The

court finds that the disclosures in the 2001 Form 10-K are more analagous to those in

Executive Telecard than in Olkey or Dodds.  While not any more obscure than many

other disclosures in the report, they are not prominently referenced in the table of

contents, appear towards the end of the report, and are in the same font as most of the

report.  Thus, although the court does not hold that the disclosures were legally

insufficient to put an investor on inquiry notice, it also cannot hold, as a matter of law, that they were sufficient for this purpose.

Considering the lack of any explicit warning that the accounting treatment used in the relevant financial statements might not reflect actual financial results, the not obviously prominent nature of the Millenium disclosures, and the approval of NYFIX's Millenium investment accounting by an accounting firm, the court finds that the facts stated in the complaint and SEC filings do not establish that NYFIX's disclosures of Millenium's losses and the method of accounting for the Millenium investment would, as a matter of law, "suggest to a person of ordinary intelligence the probability that" the company was less profitable than it appeared.  See Jackson Nat'l Life Ins., 32 F.3d at 701.  Thus, it does not dismiss plaintiff's complaint on this ground.

### 3. Pleading Standard

The parties dispute whether either the PSLRA or Rule 9(b) pleading standards should apply to plaintiffs' section 11 claim.  While the PSLRA does not apply to Section 11 claims, Rule 9(b) applies to Section 11 claims that sound in fraud.  Rombach v. Chang, 355 F.3d 164, 170-71 (2d Cir. 2004).  Plaintiffs argue that their Section 11 claims are not premised on fraud.  Defendants respond that the Section 11 claim is based on the same allegations as the Section 10(b) claims, which are premised on fraud.

Plaintiffs have gone to great lengths in the Amended Complaint to disavow fraud as a basis for the Section 11 claim, and assert that it is a strict liability cause of action. (Compl. ¶ 35).  However, the Second Circuit has held that courts need not accept assertions in a complaint that a section 11 claim is not premised on fraud, but rather should look at the individual allegations to determine if they are of the type "classically

26

associated with fraud." Rombach, 355 F.3d at 172.  In Rombach, the Second Circuit

held that allegations that a registration statement was "inaccurate and misleading,"

contained "untrue statements of material facts," and that defendants issued "materially

false and misleading written statements" were "classically associated with fraud." Id.

Although this court notes that the terms of section 11 require any plaintiff to establish

that a registration statement "contained an untrue statement of material fact or omitted

to state a material fact required to be stated therein or necessary to make the

statements therein not misleading," the plaintiffs' allegations do prominently contain the

very words Rombach states are "classically associated with fraud." (Compl. ¶ 37

(registration statement contained "materially false and misleading statements"); (id. at ¶

38 (NYFIX is "liable for the materially false and misleading statements")); (id. at ¶ 39)

(plaintiffs were damaged by "false and misleading statements")).  Moreover, although

plaintiffs assert that they do not include any fraud allegations in Count I of the

complaint, they do include several allegations in this count that they later cite in support

of their scienter arguments for the section 10(b) claim. See (Compl. ¶ 11-17 (alleging

potential motives to defraud)); (id. at ¶ 31-33 (alleging GAAP violations)).  Therefore,

despite plaintiffs' disavowals, the court must conclude in light of Rombach that the

section 11 claim sounds in fraud.

Where a section 11 claim sounds in fraud, Rule 9(b) requires plaintiffs to

establish the following elements: "'(1) specify the statements that the plaintiff contends

were fraudulent, (2) identify the speaker, (3) state where and when the statements were

made, and (4) explain why the statements were fraudulent.' " Rombach, 355 F.3d at

170  (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993)).

Although the Amended Complaint adequately alleges the first three of these elements,

it does not adequately allege the fourth. It does not adequately allege that defendants knew or were reckless in not knowing that the statements included in the registration statement were false or misleading.  In fact, the court determined above that, even considering the Count I allegations in concert with all of the additional allegations incorporated in the Exchange Act claims, the plaintiffs have failed to adequately allege scienter.  See Part III.B.2, supra.[6]

Although the Fifth Circuit has held that a court may choose to "disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated," Lone Star Ladies Inv. Club v. Schlotzsky's, Inc., 238 F.3d 363, 368 (5th Cir. 2001), the Second Circuit has cited with approval only the portion of the Lone Star opinion holding that courts are not "required to sift through allegations of fraud in search of some 'lesser included' claim of strict liability," but rather should dismiss and permit plaintiffs' counsel to file an amended claim that "that either pleads with the requisite particularity or drops the defective allegations and still states a claim."  Lone Star, 238 F.3d at 368-69, cited in Rombach, 355 F.3d at 176.  Thus, this court dismisses plaintiffs' section 11 claim without prejudice.

In light of the discussion above, the Court does not find it necessary to reach defendants' argument that the complaint establishes an affirmative defense to liability because the statements were expertised.  Plaintiffs have failed to adequately plead a violation of section 11 of the Securities Act.  Moreover, because section 15 liability is

---

[6]Note that in the Second Circuit, the PSLRA standard for scienter, which applies to the Exchange Act claim but not the Securities Act claim, is evaluated under the same standards as the Rule 9(b) standard that applies to the Section 11 claim.  Novak,  216 F.3d at 311 ("[W]e hold that the PSLRA adopted our "strong inference" standard: In order to plead scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," as required by the language of the Act itself.").

premised on a primary violation of section 11, 15 U.S.C. §78o, plaintiffs have also failed to plead a violation of section 15.

**IV.  Conclusion**

For the foregoing reasons, defendants' motion to dismiss plaintiffs' complaint is **GRANTED** without prejudice as to all counts.


**SO ORDERED.**

Dated at Bridgeport, Connecticut this 3rd day of October, 2005.


/s/ Janet C. Hall

Janet C. Hall
United States District Judge